# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **KEVIN L. BUFORD, SR. #229649,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | NO. 3:16-cv-01831 |
| ) | **CHIEF JUDGE CRENSHAW** |
| **CHERRY LINDAMOOD,** ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

Kevin L. Buford, Sr. is incarcerated in the South Central Correctional Center in Clifton, Tennessee, serving an effective 60-year sentence for facilitation of first degree felony murder and attempted especially aggravated robbery. (Doc. No. 1; Doc. No. 12-1 at 127.) He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) His petition will be denied for the reasons set forth below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

A Davidson County jury convicted Petitioner on February 12, 2010, of facilitation of first degree felony murder and attempted especially aggravated robbery. (Doc. No. 12-1 at 127.) The trial court found that Petitioner had an extensive criminal history, including two previous aggravated robberies, and sentenced him to consecutive terms of 40 and 20 years in prison. (Doc. No. 12-1 at 143–44; Doc. No. 12-3 at 60–63.) The Tennessee Court of Criminal Appeals (TCCA) affirmed the convictions and sentences on direct appeal (Doc. No. 12-18), and the Tennessee Supreme Court denied the Petitioner's application for review on October 17, 2012. (Doc. No. 12-21 at 49.)

On April 29, 2013, Petitioner filed a *pro se* petition for post-conviction relief. (Doc. No.

12-21 at 50–57.) The post-conviction court appointed counsel,[1] who filed an amended petition. (Doc. No. 12-21 at 74–78). The court held a hearing on May 28, 2014, and denied relief by order entered July 11, 2014. (Doc. No. 12-21 at 95–102; Doc. No. 12-22.) The TCCA affirmed on August 11, 2015. Buford v. State, No. M2014-01534-CCA-R3-PC, 2015 WL 4735661, at *14 (Tenn. Crim. App. Aug. 11, 2015), appeal denied (Tenn. Dec. 11, 2015). The Tennessee Supreme Court denied discretionary review on December 11, 2015. Id. at *1.

Petitioner now seeks the federal writ of habeas corpus pursuant to 28 U.S.C. § 2254, and Respondent acknowledges that the petition is timely. (Doc. No. 13 at 2.)

## II. STATEMENT OF FACTS

The state presented evidence at Petitioner's trial that a robbery attempt by Petitioner, along with his brother, his two sons, and a friend of his sons, resulted in the victim's death. The TCCA summarized that evidence at length on direct appeal, but only the following summary of the codefendant Raymond Pirtle's testimony is relevant to the claims before this Court:

> The State's next witness was Mr. Raymond Pirtle, one of the defendant's codefendants. Mr. Pirtle testified that he had been a friend of the defendant's sons, D'Angelo Buford and Kevin Buford Junior, for many years but that he met the defendant for the first time on the day of the shooting. Mr. Pirtle testified that some weeks before the incident, he had bought a gun "off the streets" for his own protection. This gun was a 9mm Smith & Wesson. Mr. Pirtle testified that about three weeks before the incident, he gave this gun to D'Angelo Buford and Kevin Buford Junior, after they had asked him to borrow it. He testified that on the day of the incident, Kevin Buford Junior came to his house and asked him if he wanted to commit a robbery. Mr. Pirtle replied that he did. When he went outside, the defendant and D'Angelo Buford were also present, waiting for him in a gold SUV. Mr. Pirtle testified that the defendant was driving the vehicle. Mr. Pirtle testified that after he got inside the SUV, all four of them drove to a Burger King. He testified that at some point during this drive he heard D'Angelo Buford cock a gun.
>
> When they arrived at the Burger King, the defendant told Mr. Pirtle that a friend of his had told him about a car lot that they could rob. Mr. Pirtle testified that the defendant told the other three to act as if they wanted to buy a car, and then, when

---
[1] The Court is unable to locate the order appointing counsel in the record, but the substance of that order is not material to the issues before the Court.

the owner let them in, to rob him.

Mr. Pirtle testified that he, Kevin Buford Junior, and D'Angelo Buford all got out of the SUV to rob the car lot, and he saw D'Angelo Buford carrying a gun at that time. He testified that as they approached the car lot, he told Kevin Buford Junior and D'Angelo Buford that he had a bad feeling. They appeared to agree, and after about three minutes all the three of them went back to the SUV. Mr. Pirtle testified that after they got back into the SUV, the defendant continued to urge them to rob the car lot, describing various methods the three might use to get in. He testified that the three of them did not respond, and the defendant got angry and sped away.

Next, Mr. Pirtle testified that the defendant drove them to an Auto Zone, and told them to wait in the SUV while he went inside to see if there were any surveillance cameras. Mr. Pirtle testified that the defendant returned about five minutes later and drove away from the Auto Zone. During this drive, the defendant made a phone call to someone and asked the person on the other end of the call about robbing some white guy. Then the defendant pulled into a gas station. The defendant told the rest of the group that they did not have enough money to buy gas to return home, and he appeared unhappy about the situation. Mr. Pirtle testified that the group then left to go pick up some marijuana from one of Mr. Pirtle's friends, known by the street moniker "Little E," who lived in some nearby apartments. He testified that he got out of the SUV alone, went to his friend's house, and bought twenty dollars worth of marijuana.

Following this, the group drove to pick up Robert Buford, the defendant's brother, from his workplace. After picking him up, the defendant drove all five individuals to a liquor store ... for the purpose of robbing one of the many people frequenting a nearby business. Mr. Pirtle testified that the defendant told the group that he knew "a place where a lot of Mexicans cash their checks," and that he suggested that they all stay in front of the liquor store, pretending to drink liquor. Mr. Pirtle testified that the defendant told the group that he was going to tell them which individual to rob after he watched them cash their checks. Mr. Pirtle testified that the defendant went into the liquor store and purchased some vodka, which was sampled by the entire group. Mr. Pirtle testified that the group had been waiting for about thirty minutes when the defendant stated that a woman who was cashing her check was about to come out and instructed him, D'Angelo Buford, and Kevin Buford Junior to rob her. Mr. Pirtle testified that when this woman came out of the store, the three of them told the defendant that they were not going to rob her, and the defendant drove away.

After the group left, various members put forward different suggestions concerning the next place they should go to commit a robbery. Mr. Pirtle testified that eventually the defendant told his son D'Angelo to call back "Little E" and request to buy some additional marijuana so that the group could rob him. D'Angelo did so. Mr. Pirtle testified that the defendant drove to a prearranged meeting location near a convenience store, and that Robert Buford got out of the SUV carrying a gun. According to Mr. Pirtle's testimony, the plan was to allow "Little E" to approach the SUV, and then Robert Buford (whom the dealer had not met) would come from behind and rob him—thereby fooling the dealer into believing that he

had been robbed by a random person. Mr. Pirtle testified that the group executed this robbery as planned. Afterward, the defendant drove the SUV a short distance away and picked up Robert Buford, who now had marijuana and some money.

Following this robbery, Mr. Pirtle testified that ... the defendant then calmly told the group "now I got 15 minutes to do a robbery before I go and pick up my wife from work." Mr. Pirtle testified that at that point Kevin Buford Junior started acting "hyped up"—talking louder than normal and "swaggering."

Mr. Pirtle testified that D'Angelo Buford tried to calm Kevin Buford Junior down, but the defendant discouraged his efforts. Mr. Pirtle testified that the defendant pulled into a car wash on Clarksville highway and parked the SUV. Mr. Pirtle testified that they saw the victim walking by, and the defendant stated that the victim looked like he had some money. Mr. Pirtle testified that the defendant told the others to go rob him. After the victim walked past the SUV, Kevin Buford Junior and Robert Buford got out of the car and followed him. Mr. Pirtle testified that Robert Buford had the gun with him at this time. Mr. Pirtle testified that he also got out of the SUV and followed the other two to assist them.

Mr. Pirtle testified that the victim walked into a grocery store, and they waited for him to come out. Mr. Pirtle testified that when the victim walked out of the store, Kevin Buford Junior ran over and hit the victim in the head with a gun.

Mr. Pirtle testified that the victim turned around and swung at Kevin Buford Junior, and then Kevin Buford Junior shot the victim. The victim ran toward the nearby car wash. Mr. Pirtle testified that he, Kevin Buford Junior, and Robert Buford all got back into the SUV, and then the defendant drove them away.

Mr. Pirtle testified that during this car ride, the group was yelling at Kevin Buford Junior for shooting the victim. Mr. Pirtle testified that Kevin Buford Junior responded "he hit me, I did not know what to do." The defendant drove D'Angelo Buford and Kevin Buford Junior home. After dropping them off, the defendant drove Mr. Pirtle to a small market. Mr. Pirtle testified that he gave the defendant five dollars, and the defendant went into the store and bought him a cigarillo so that he could smoke the rest of his marijuana. The defendant then drove Mr. Pirtle home. Mr. Pirtle testified that when he left, the defendant and Robert Buford were still in the front seat of the SUV.

Mr. Pirtle testified that ... he did not have the gun [when the police arrested him], and the last time he saw it, it was in D'Angelo Buford's possession as he was being dropped off after the shooting.

Mr. Pirtle testified that ... he had not been offered anything from the State in return for his testimony, but he was hoping for some sort of leniency. He testified that he had been in trouble at school, and sometimes suspended, for cutting classes, fighting, and possessing a weapon. In conclusion, Mr. Pirtle testified that the defendant was the person who had directed all of the various participants to do the various robberies on the day in question, including the attempted robbery of the victim.

....

Mr. Pirtle also admitted that in January of 2008, he was a member of the Gangster Disciples and was living a "gangbanger's life." He admitted that he willingly joined Kevin Buford Junior, D'Angelo Buford, and the defendant on the day in question for the purpose of committing robberies, and he was a willing participant in the robbery and attempted robberies that were committed that day. He admitted that he had been previously arrested, that he had been disciplined at school on numerous occasions, and that he had been disciplined while in police custody for committing various criminal and antisocial acts.... He claimed to have left the Gangster Discipl[es] the year before, and he testified that he would not lie to protect his former gang members.

Mr. Pirtle testified that the defendant never held the gun on the day of the robberies. He testified that he never saw Kevin Buford Junior tell the victim to give him any money and never saw the victim give anything to him. He testified that Kevin Buford Junior did not get anything from the victim. He testified that the defendant did not know that anyone had been shot until the group returned to the SUV after the shooting.

Mr. Pirtle testified that although he had smoked marihuana and drunk vodka on the day of the robberies, this combination had not made it difficult for him to remember events as they happened that day. He admitted that he had probably told a doctor something to the contrary—that he had "blacked out" on the day in question—during his mental health evaluation but offered no explanation for why he had done so. Defense counsel also impeached Mr. Pirtle with numerous prior statements he had made—both to police during the investigation and under oath at an earlier hearing—that were inconsistent with his trial testimony. Mr. Pirtle testified that he did not know why the defendant had stated that the group did not have enough money for gas to return home, given that the defendant had enough money to purchase vodka at the liquor store and that the defendant had driven them home after the shooting without filling up the SUV.

On redirect examination, Mr. Pirtle pointed out that the drug dealer the group had robbed on the day of the shooting was a fellow Gangster Disciples member.

Mr. Pirtle also testified that D'Angelo Buford and Kevin Buford Junior were members of the Gangster Disciples. Mr. Pirtle explained that when he was answering questions posed by his doctor and the police, he was not under oath, as he was when he gave his direct testimony. Next, the prosecutor went over statements made by Mr. Pirtle at the earlier hearing in detail and generally attempted to explain away the apparent inconsistencies—partly on the basis that Mr. Pirtle's testimony at the earlier hearing was much more brief and less detailed. The prosecutor also emphasized the numerous statements made by Mr. Pirtle during his direct testimony that were consistent with his earlier testimony.

State v. Kevin L. Buford, Sr., No. M2010–01618–CCA–R3–CD, 2012 WL 1895953, at *8–12

(Tenn. Crim. App. May 24, 2012), appeal denied (Tenn. Oct. 17, 2012).

## III. ISSUES PRESENTED FOR REVIEW

The amended petition identifies a single ground for relief – "[t]he state court erred by dismissing Petitioner's petition for post-conviction relief" – and goes on to complain of trial counsel's failure to preserve an issue related to alleged improper argument by the prosecutor and of appellate counsel's failure to assert plain error in connection with that argument. (Doc. No. 1 at 4–7.) The Court construes the amended petition to allege that the state post-conviction court unreasonably rejected two claims:

1. Trial counsel was ineffective for failing to include in his motion for new trial the claim that the prosecutor improperly vouched for Mr. Pirtle's credibility during closing argument (Doc. No. 1 at 5–6); and
2. Appellate counsel was ineffective for failing to assert on direct appeal that the trial court committed plain error in allowing the prosecutor to vouch for Mr. Pirtle's credibility (Doc. No. 1 at 6–7).

## IV. STANDARD OF REVIEW

### A. AEDPA Review on the Merits

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and

federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds

it erroneous or incorrect. Id. at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. Id. at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read Matthews to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. Pinholster, 563 U.S. at 181.

### B. Ineffective Assistance of Counsel

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 688, 689. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Prejudice, under Strickland, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

> The Supreme Court has further explained the Strickland prejudice requirement as follows:
>
> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need

9

not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. at 101. As the Supreme Court clarified in Harrington,

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (internal quotation marks and citation omitted).

## V. ANALYSIS AND DISCUSSION

### A. Relevant Context

The following facts and law, as summarized by the TCCA on post-conviction appeal, are relevant to both of Petitioner's claims:

[T]he trial transcript submitted in the appeal of the convictions shows that the prosecutor referred to Mr. Pirtle's testimony during her closing argument. She stated, in relevant part,

> Now, let's talk some about Raymond Pirtle, because there isn't any question but that he is at the center of this case. Let's talk about the deal. There is no deal. I have told Mr. Pirtle that if he testifies truthfully, not if he makes me happy as [counsel] wants to make it sound, but if he testified truthfully I, the State, will consider that in determining if he will get some sort of reduced offer and I am here to tell you that that is exactly what I am going to do.

Counsel objected on the ground that the prosecutor could not "personally discuss like that." The trial court stated that the prosecutor was only "arguing in rebuttal for what [counsel] suggested." The court told the prosecutor that she could not address "anything personal about what [the prosecutor] could do." The prosecutor stated,

> I am here to tell you that he does not have a deal, but he was promised consideration and what that means is it will be considered, if in fact he testifies truthfully it will be considered to his favor and you know what? Sometimes we have to do that. It doesn't mean that the person who comes in here and testifies even if he testifies truthfully is going to walk, that is not what it means.

Counsel objected, and the court overruled the objection. The prosecutor continued without further objection. She stated,

> [T]here are times when in order to be able to give a jury like yourselves the full picture of what happened ... we have to do this. Now, is Mr. Pirtle a troubled youth ... ? Yeah. He is a gangbanger. He admitted it freely.
>
> He is a Gangster Disciple ... no question about it, ... and you know [counsel] said, well, would you trust him? Would you trust him? I don't know. [The Petitioner] trusted him when he needed somebody to go out and do an aggravated robbery that is who he went to along with his two sons who were members of the Gangster Disciples[.]
>
> Now just think about it for a minute, if you wanted to do an aggravated robbery with someone would you go to your Sunday School teacher or your grandmother? No. You are going to go to these types of people. The State did not [choose] the type of people that [the Petitioner] was going to get into this kind of environment with, he chose it, and that is where we are and ... his demeanor, boy, this is a tough one to talk about because [counsel] seemed pretty convinced when he was up here that it was clear to everybody in here that he was not telling you the truth. You are the judges of that.

You are the judges of that, but don't get confused about one thing just because we believe that Mr. Pirtle is a gangbanger ... that does not mean he was not being honest on the stand and you make your own decision, but I thought his demeanor here was pretty darn good, you know.

The cross-examination he went under I thought he kept his composure but that is for you to decide but it certainly could be concluded that he kept his composure with the kind of cross-examination he had[.] [T]here are some people, not even gangbangers, just your average person who has not been able to keep the composure that Mr. Pirtle kept in this court.

Inconsistencies, in closing argument [counsel] just said that there were all of these major inconsistencies but he did not really talk about very many of them and there was a lot of cross-examination about inconsistencies by [counsel] of Mr. Pirtle, ... like sometimes I felt like it wasn't ever going to end, but most of those were about absolutely nothing. Do you remember the lengthy cross-examination about whether ... [the Petitioner's son] came into the house or just to the house?

[Counsel is] making it sound like this was some giant lie, because at one point into the house and another time he said to the house and Mr. Pirtle said, look, you know I was going to open the door for him and let him in he just didn't come in. I mean, we spent how much time on that? That is nothing. That has nothing to do with any essential element of the crime, even if you think Mr. Pirtle was lying and I don't think that that is the reasonable conclusion for that.

I mean, the reasonable conclusion is to, in, I mean, we probably all say things like that all of the time. Same thing with one Vodka bottle, two Vodka bottles and then the cell phone, I mean my goodness the cell phone. Mr. Pirtle, did you ... have a cell phone? Well, no. But you said before that you did, well, I mean, I have one, but I didn't know if I left it in the car. I didn't know where it was. But, you said you did and you told the officer the next day that you had a cell phone. Well, yeah, I did.

...It was an attempt by [counsel], he was doing his job to create inconsistencies. Those kind of things, first of all, again, I think any reasonable person understands what Mr. Pirtle was saying there. There wasn't truly an inconsistency; and second, even if it wasn't about anything essential, it was minor stuff and then you heard of course [the co-prosecutor's] very long list of consistencies. He told a consistent story on the major points.

Closing argument is "a valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001); see State v. Bane, 57 S.W.3d 411,

12

425 (Tenn. 2001); State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); see State v. Jordan, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. Terry, 46 S.W.3d at 156; Cauthern, 967 S.W.2d at 737; Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.
>
> Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

Goltz, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. Bane, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment,

the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see Goltz, 111 S.W.3d at 5–6.

Buford v. State, No. M201401534CCAR3PC, 2015 WL 4735661, at *11–13 (Tenn. Crim. App. Aug. 11, 2015), appeal denied (Dec. 11, 2015).

### B. Claim One

Petitioner alleges that his trial counsel was ineffective for failing to move for a new trial based on the prosecutor's vouching for Mr. Pirtle's credibility in the portions of her closing argument quoted above, and that he was prejudiced by that failure because it prevented review of the alleged prosecutorial misconduct on direct appeal. (Doc. No. 1 at 5.) The TCCA affirmed the post-conviction court's rejection of that claim:

> The post-conviction court denied relief. Relative to trial counsel's failure to allege in the motion for a new trial that the prosecutor improperly vouched for Mr. Pirtle's credibility, the court concluded that counsel did not provide ineffective assistance. The court found that counsel objected during the prosecutor's closing argument twice and that the trial court ruled accordingly. The post-conviction court noted that counsel raised multiple issues in the motion for a new trial and was not expected to raise every conceivable issue. The court also found that even if counsel were deficient in this regard, the Petitioner failed to show any prejudice because no evidence suggested that the issue would have had merit on appeal.
>
> . . .
>
> On appeal, the Petitioner contends that the post-conviction court erred by concluding that trial counsel provided the effective assistance of counsel. He argues counsel was ineffective by failing to allege in the motion for a new trial that the prosecutor improperly vouched for Mr. Pirtle's credibility during her closing argument. He asserts he has established prejudice in connection with his ineffective assistance claim because this court waived consideration of the issue in the appeal of his convictions. He asserts the only "remaining question" is whether counsel's failure to include the issue in the motion for a new trial constitutes deficient performance, and he argues in the affirmative.
>
> . . .
>
> To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced

14

the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368–72 (1993). The Tennessee Supreme Court has applied the Strickland standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. See State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the Strickland test in order to prevail in an ineffective assistance of counsel claim. Henley, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered ..., are [not] within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); see Strickland, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); see Pylant v. State, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed ... based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

As a preliminary matter, the Petitioner erroneously argues that he has suffered prejudice pursuant to Strickland because this court waived consideration of the issue related to the prosecutor's improper vouching of Mr. Pirtle's credibility. In order to establish prejudice based on the Petitioner's contention, the Petitioner must establish that but for trial counsel's alleged deficient performance of failing to include the issue in his motion for a new trial, the outcome of the appeal of the Petitioner's convictions would have been different had this court considered the issue on its merit. With this in mind, we consider whether counsel provided ineffective assistance.

The record reflects that trial counsel did not include in the motion for a new trial the issue surrounding the prosecutor's improperly vouching for Mr. Pirtle's credibility during the State's closing argument. The issue was first raised on appeal, and this court waived consideration of the issue pursuant to Tennessee Appellate Procedure Rule 3(e) and did not consider the issue as a matter of plain error. See Kevin L. Buford, Sr., 2012 WL 1895953, at *27.

We note that no evidence was presented at the post-conviction hearing relative to the prosecutor's alleged improper vouching or trial counsel's objections and that the Petitioner does not identify the comments he considers improper. Counsel testified that he had not reviewed the transcript of the trial proceedings and could not recall if he objected to the State's closing argument. In any event, the trial

transcript submitted in the appeal of the convictions shows that the prosecutor referred to Mr. Pirtle's testimony during her closing argument.

. . . [See text quoted in Section V.A. above.]

The record reflects and trial counsel testified at the post-conviction hearing that Mr. Pirtle's credibility was a significant factor at the trial, that he cross-examined Mr. Pirtle extensively, and that he discussed during his closing argument Mr. Pirtle's lack of credibility. The prosecutor, as a result, addressed Mr. Pirtle's credibility in response to counsel's closing argument. The prosecutor told the jurors that they were "the judges" of Mr. Pirtle's credibility and discussed various factors that supported a reasonable inference that Mr. Pirtle provided truthful testimony in spite of minor inconsistencies in his statements and his gang affiliation. However, the prosecutor's comment that she thought Mr. Pirtle's "demeanor ... was pretty darn good" was an expression of her opinion about Mr. Pirtle's credibility. See, e.g., State v. Sexton, 368 S.W.3d 371, 419–20 (Tenn. 2012) (Vouching occurs when a prosecutor expresses personal opinion that a witness is telling the truth). Likewise, relative to the minor inconsistencies in Mr. Pirtle's testimony and prior statements, the prosecutor told the jurors, "[E]ven if you think Mr. Pirtle was lying ... [,] and I don't think ... that is a reasonable conclusion [.]" The prosecutor's comment constituted improper vouching because it was an expression of her personal opinion about Mr. Pirtle's credibility. See id. at 420.

Although we conclude that the prosecutor made improper comments during the State's closing argument regarding Mr. Pirtle's credibility, we conclude that the comments were insignificant in view of the overall tenor of the prosecutor's closing argument. The record reflects that trial counsel's cross-examination of Mr. Pirtle and counsel's closing argument focused on Mr. Pirtle's credibility. The prosecutor's improper comments were in rebuttal to counsel's suggestions that Mr. Pirtle was not credible and focused on the inconsistencies addressed by counsel. The remainder of the prosecutor's argument focused on other evidence and the reasonable inferences to be drawn from that evidence. We conclude that the comments did not affect the outcome of the trial and that the Petitioner is not entitled to relief on this basis.

Buford v. State, No. M201401534CCAR3PC, 2015 WL 4735661, at *9–14 (Tenn. Crim. App. Aug. 11, 2015), appeal denied (Dec. 11, 2015).

The state court properly identified and explained the applicable standard from Strickland in its analysis above. It then carefully examined the objectionable portions of the prosecutor's closing argument and the law applicable to claims of prosecutorial misconduct during closing, and concluded that Petitioner was not entitled to relief because "the comments were insignificant in view of the overall tenor of the prosecutor's closing argument" and "did not affect the outcome of

the trial." Id. at *14. The TCCA found no merit in Petitioner's underlying prosecutorial misconduct issue,[2] and implicitly concluded – without expressly articulating – that Petitioner was not prejudiced under Strickland by counsel's failure to preserve that issue.

The TCCA thus rejected Petitioner's ineffective-assistance claim on Strickland's prejudice prong, without addressing the performance prong or the post-conviction trial court's analysis of counsel's performance, as Strickland explicitly permits. See Strickland, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). The state court's failure to spell out every step of its Strickland analysis does not affect the validity of its ruling under AEDPA. Harrington v. Richter, 562 U.S. 86, 98 (2011) ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); Harris v. Stovall, 212 F.3d 940, 945 (6th Cir. 2000) ("Where a state court decides a constitutional issue . . . without extended discussion, a habeas court

---

[2] To the extent that Petitioner may be challenging this piece of the state court's analysis, he has not established that it was erroneous, much less unreasonable. In federal claims of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted) (denying relief on the basis of inflammatory prosecutorial argument). To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005) (quoting Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997)). The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." Id. Accordingly, if a court finds improper conduct, it must consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." Id. In this case the prosecutor described a witness's demeanor as "pretty darn good" and said that it would be unreasonable to conclude that he was lying, but she also correctly reminded the jurors twice that "you are the judges of that," and largely focused on the evidence corroborating the witness's account and the relative insignificance of his inconsistencies. The state court's determination that the prosecutor's improper comments were not sufficiently flagrant to require reversal in that context was not unreasonable in light of the exceedingly high standard for prosecutorial misconduct claims.

17

should then focus on the result of the state court's decision."); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Reading into the statute a requirement that state courts spell out their rationale would run counter to the main thrust of the amendments to the habeas corpus provisions that were enacted as part of [AEDPA]. . . . Requiring state courts to put forward rationales for their decisions so that federal courts can examine their thinking smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era.").

This Court's role in habeas review is to determine whether the state court acted unreasonably when it found Petitioner's counsel was not constitutionally ineffective. 28 U.S.C. § 2254(d). This Court's own opinion of whether counsel was actually effective is not determinative. A federal court must not find a state court's ruling unreasonable unless it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. at 103. The TCCA's ruling was not unreasonable under that standard. The court provided a reasonable basis for its conclusion that the failure to preserve the underlying misconduct claim did not affect the outcome of Petitioner's case, and it reasonably applied Strickland to the facts in the record. Petitioner is not entitled to relief on this claim.

### C. Claim Two

Petitioner also claims that appellate counsel was ineffective for failing to seek plain error review of the prosecutorial misconduct issue, which he argues "amounts to a second level of prejudice suffered in this matter by the Petitioner." (Doc. No. 1 at 6–7.) The TCCA rejected that claim:

> The Petitioner also argues that appellate counsel was deficient for failing to request [that] this court consider the issue of prosecutorial misconduct as a matter of plain error. Our analysis precludes the possibility that had appellate counsel raised the issue, plain error relief would have been granted. We note that the Petitioner failed to present any evidence at the post-conviction hearing relative to appellate counsel.

The Petitioner is not entitled to relief on this basis.

Buford v. State, No. M201401534CCAR3PC, 2015 WL 4735661, at *14 (Tenn. Crim. App. Aug. 11, 2015), appeal denied (Dec. 11, 2015).

Again, the TCCA did not communicate the details of its application of Strickland to those circumstances, but it obviously concluded that Petitioner was not prejudiced by appellate counsel's failure to raise an issue on which he had no chance of prevailing. Its rejection of this claim was therefore a reasonable disposition under Strickland's prejudice prong. Petitioner is not entitled to relief on this claim.

## VII. CONCLUSION

Petitioner's claims fail on their merits under AEDPA for the reasons set forth above. Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order shall enter.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　WAVERLY D. CRENSHAW, JR.
　　　　　　　　　　　　　　　　　　CHIEF UNITED STATES DISTRICT JUDGE